The opinion of the Court was delivered by
Wardlaw, A. J.
The case which we have to decide must be made up by culling a few particulars from the mass of testimony which is contained in the Judge’s notes, that have been reported to us. Although there is some discrepancy between different witnesses, it is not so much as is usually found between eye witnesses of an affray, and we conceive that the following statement exhibits a fair condensation of the whole testimony, upon the points now material.
The deceased was keeper of a restaurant, and was in the prime of life, large, stout and vigorous. The prisoner, older, and comparatively feeble, frequented the restaurant, and was a familiar companion of the keeper. The two spent most of the day, on which the killing took place, in playing bagatelle, at a table in the restaurant, friendly, and occasionally drinking together. Late in the afternoon, the *60 prisoner, seeming about to depart, was, bv the deceased, called upon to pay $ 1.50, as the balance against him on the day’s reckoning. He claimed an abatement, but went, saying that he was going to the post office, which was next door, and would immediately return and pay. He was watched by the deceased, endeavored to escape into another street, by going through the post office, but was by the deceased overhauled, and pushed into the restaurant through a back gate. In a few minutes, a noise as of a scuffle between these parties, occurred in the restaurant; the deceased choked and slapped the prisoner; they were separated; they talked of the $1.50, and what it was for. The prisoner was, by the deceased, interrupted in an attempt to go through the front door: was jerked, threatened and struck. Again they were separated, and again they talked. The deceased jammed the prisoner’s head against the wall, and threw him off. The deceased rested with his arm on the counter, — the prisoner near the bagatelle table, to which he had got, at, or soon after the last mentioned contact of the parties, pulled a knife from his pantaloons pocket, opened it with his hands behind his back, and hastily advanced toward the deceased, with the knife held before him in his hand, open, but probably not seen by the deceased. The deceased still stood at the counter, and when the prisoner was within reach, the deceased kicked, and simultaneously the prisoner made a lunge at him with the knife. The kick reached the prisoner’s groin ; the knife cut the femoral artery of the deceased, occasioning his death in a few minutes. From the time when the deceased caught.the prisoner, after the latter left the post office, until the fatal blow with the knife, the parties were always in presence of each other, and there was continued action between them, as above mentioned, the whole occurring in a short time.
Here appears to have been a killing, by means of a deadly weapon, upon sudden occasion, after great provoca *61 tion, of tbe kind denominated legal. There was not tbe taking of unfair advantage, in tbe course of a mutual combat, suddenly begun, upon equal terms; for the prisoner does not appear to have been, at any time before the fatal blow, engaged in any other combat than the attempt to get out of the hands of one who was superior to him in strength. There was not the treacherous resort in the course of the scuffle to a weapon purposely provided beforehand; for the pocket-knife, which proved so deadly, cannot be presumed to have been carried with evil purpose. The worst feature in the case is, that, as we understand, the knife was opened with the hands behind the back, as if by stealth and cunning contrivance. This shows thought, but not necessarily malicious premeditation. With thooght of the knife there may have come fear that its use would be prevented by the deceased’s stronger arm. All the hurried action of body and mind which violent emotions produce, sometimes effects in an instant the contrivance of expedients which in slower moods would indicate study. There was here no previous grudge nor threat — no symptom of spite toward the deceased, or of general malevolence, outside of what the transaction as detailed may establish; and the most unfavorable inference should not be drawn from the only circumstance that we think could be urged to show the malice which in some form is an essential ingredient of murder. It is a hard construction of the prisoner’s testimony which finds evidence of coolness and premeditation in his declaration that he was not so excited by liquor as not to know and remember what took place. We hold the case as we have stated it to be, manslaughter. Possibly, another jury may find that the facts of the case were not such as we understand them to have been, and that by treachery, coolness or brutal ferocixy, the prisoner did manifest malice, by Avhich, and not by sudden provocation, he was impelled.
Upon a new trial, this opinion, like cases reported on the *62 subject, will be mere authority, and from the evidence beard de novo the jury must form their own conclusions. In our interference with the verdict heretofore found, we are emboldened by the circuit Judge’s expression of the satisfaction and pleasure which the grant of a new trial would bring to him, and by the form of the verdict, “guilty, but recommended to mercy.” The recommendation is not properly any part of the verdict, but is only a form, frequently adopted, of application for executive clemency. But when no reason for a recommendation is given, it is generally supposed to be the result of compromise amongst jurors, and to indicate doubt, as well as desire, that the extreme penalty of the law should not be executed. In a case which, under a favorable view of the circumstances, might in law be deemed manslaughter, conscientious and intelligent jurors, who are averse to that view, may well consider whether the chance of blood guiltiness escaping wholly unpunished, is not more likely to be promoted by a general verdict of guilty, with a recommendation to mercy, than by a verdict of manslaughter.
It is not necessary that we should say more. But the frequent acquittals, under pretext of self-defence, of persons whose hands have been stained by the blood of their fellow-men, unnecessarily slain, admonishes us to guard our ruling against misconstruction, by declaring that we mean in no way to intimate that we have discovered any evidence of the unavoidable necessity for killing, to escape great bodily harm, which would entitle the prisoner to a verdict of not guilty.
A new trial is ordered.
DuNKIN, C. J. and Lstglis, A. J., concurred.

Motion granted.